'09 CIV 1885

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

MAURICE R. GREENBERG,                                    :
                                                         :
                                    Plaintiff,           :
                                                         :
            v.                                           :    File No. ___ Civ. ____
                                                         :
AMERICAN INTERNATIONAL GROUP, INC.,                      :    **JURY TRIAL DEMANDED**
MARTIN J. SULLIVAN, STEVEN J. BENSINGER,                 :
JOSEPH CASSANO, STEPHEN F. BOLLENBACH,                   :
GEORGE L. MILES, JR., MORRIS W. OFFIT, and               :
MICHAEL H. SUTTON,                                       :
                                                         :
                                    Defendants.          :
                                                         :
------------------------------------------------------------ X

## COMPLAINT

Maurice R. Greenberg ("Plaintiff") alleges the following upon his personal knowledge or

otherwise on information and belief.

## NATURE OF THE ACTION

1.      This action arises out of Defendants' material misrepresentations and omissions

concerning multi-billion dollar losses in American International Group, Inc.'s ("AIG") portfolio

of credit default swaps ("CDS"). Plaintiff brings this action under Sections 10(b) and 20(a) of

the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated

thereunder, and under New York state law for common law fraud.

2.      Defendants' material misrepresentations and omissions caused Mr. Greenberg to

acquire, at an artificially inflated price, stock in AIG awarded to him by Starr International

Company, Inc. ("SICO") as part of the Deferred Compensation Profit Participation Plans

("DCPPPs"). Mr. Greenberg seeks to recover the difference between the price at which he

acquired AIG shares and the price of the true and fair value of these shares had Defendants not engaged in material misrepresentations and omissions.

3.      Defendants' material misrepresentations and omissions, which artificially inflated the price of AIG shares, also caused Mr. Greenberg to pay excessive income tax on the AIG shares that he acquired.  Mr. Greenberg seeks to recover the difference between the tax that he actually paid as the result of the artificially inflated AIG share price and the tax he would have been required to pay based on the price of the true and fair value of these shares had Defendants not engaged in material misrepresentations and omissions.

## SUMMARY OF THE ACTION

4.      AIG has described itself as the leading international insurance organization, with operations in more than 130 countries and jurisdictions.  It was, until September 18, 2008, one of the thirty component companies of the Dow Jones Industrial Average.

5.      Mr. Greenberg retired in March 2005.  Following Mr. Greenberg's retirement, his successor as CEO, Defendant Martin Sullivan, and Mr. Greenberg's successor as Chairman, Frank Zarb, presided over the rapid increase of AIG's volume of CDS, a form of credit default insurance.  Most of the increase involved collateralized debt obligations ("CDOs") exposed to subprime mortgages.  By the summer of 2008, AIG was a leading issuer of CDS insuring CDOs. As of December 31, 2007, CDS issued by AIG hedged the default risk on at least $527 billion in debt, including debt securities backed by subprime mortgages.

6.      Notwithstanding AIG's large CDS positions, AIG and certain of its officers and directors issued a series of false and misleading statements relating to AIG's finances that artificially inflated the price of AIG stock.  AIG reported impressive earnings of $4.39 billion, $4.28 billion, and $3.08 billion for the first three quarters of 2007.  Between May 2007 and

January 2008, Defendants repeatedly assured the market that AIG was well-positioned to continue producing significant earnings, in spite of the turmoil during 2007 arising from the collapse of the subprime residential mortgage market.  In particular, AIG consistently assured investors of the security of its "super senior" CDS portfolio, representing to investors that it was highly unlikely to suffer any actual losses as a result of the mortgage meltdown.

7.    AIG made repeated statements touting its sophisticated and conservative risk management strategies and the effectiveness of such strategies in limiting any foreseeable losses arising from its CDS portfolio.  For example, on August 9, 2007, during the second quarter earnings conference call with analysts, AIG executives represented that the risk undertaken "is very modest and remote, and has been structured and managed effectively" and that AIG "see[s] no dollar [] loss associated with any of [the CDS] business."  In fact, Defendant Joseph Cassano, the former head of AIG's derivative unit, declared in reference to AIG's CDS portfolio that "it is hard for us with, and without being flippant, to even see a scenario within any kind of realm of reason that would see us losing $1 in any of those transactions."

8.    On November 8, 2007, Defendant Sullivan reiterated that AIG did not "expect to pay any losses on this carefully structured and well-managed [CDS] portfolio."  Amid such reassurances to the market, AIG, on November 14, 2007, declared its normal quarterly cash dividend and further announced that its Board of Directors had replenished AIG's existing share repurchase program by authorizing the repurchase of an additional $8 billion in common stock.  AIG's November 14, 2007 press release stated that "[b]ased on current market conditions and AIG's continued generation of excess capital, AIG expects to accelerate the repurchase of the remaining $3 billion of the $8 billion authorized earlier in 2007 as market conditions permit."

9.      Further assurances concerning AIG's CDS portfolio were provided at an investor meeting on December 5, 2007, where AIG's then-CEO, Defendant Sullivan, stated that the possibility that these swaps would sustain a loss was "close to zero" and that AIG's valuation models had proven to be "very reliable" and provided AIG with "a very high level of comfort."

10.      As Defendants were making these types of representations, they knew, or recklessly ignored, facts indicating that AIG faced mounting losses on its CDS portfolio and other instruments linked to the subprime residential mortgage market.  For example, AIG's Form 8-K filed on February 11, 2008 revealed to investors that AIG's independent auditor, Pricewaterhouse Coopers LLC ("PwC"), had discovered "material weakness in [AIG's] internal control over financial reporting and oversight relating to the fair value valuations of the … super senior credit default swap portfolio."  As a result, AIG was required to drastically modify its method of accounting in its CDS portfolio.  As a result of applying the new valuation method, AIG's actual losses on its CDS portfolio more than quadrupled to between $4.5 and $6 billion as of November 30, 2007, a massive increase from the $1.4 – $1.5 billion loss valuation first reported by AIG as of that date at the December 5, 2007 investor meeting.

11.      According to a *Wall Street Journal* article entitled "AIG Is Forced To Write Down Mortgage Links" published on February 12, 2008, "AIG went to great lengths to tell investors about the company's exposure to subprime mortgages and estimated its losses on those instruments would be much smaller . . . ."

12.      On February 28, 2008, AIG again revised the valuation on this same CDS portfolio, reporting in its Form 10-K an upward modification of cumulative losses in its CDS portfolio of $11.5 billion as of December 30, 2007.  Thus, AIG's reported losses on its CDS portfolio for the same period jumped from $1.4 – $1.5 billion in December 2007, to $4.5 – $6.5

billion in mid-February 2008, to $11.5 billion on February 28, 2008. AIG also reported a fourth-quarter 2007 loss of $5.3 billion, its largest quarterly loss ever.

13.      AIG also disclosed in its February 28, 2008 Form 10-K, for the first time, that it had notional exposure of over $6.5 billion in liquidity puts that it had written on CDOs linked to subprime residential mortgages. Unbeknownst to investors, AIG had been forced to repurchase over $754 million in CDO securities at par value in 2007 pursuant to the terms of these liquidity puts, and AIG had provided $3 billion in liquidity facilities in case it was required by counterparties to repurchase additional CDOs over the next three years. AIG also reported that Defendant Cassano, the head of the entity responsible for AIG's CDS portfolio, was resigning.

14.      Defendants' knowing or reckless misrepresentations regarding AIG's true financial state and their failure to disclose the true losses arising from AIG's CDS portfolio artificially inflated the price of AIG stock.

15.      As Defendants intended and expected, Mr. Greenberg read and relied on AIG's material misrepresentations and omissions. As a result, Mr. Greenberg acquired, on or about January 30, 2008, at an artificially inflated price, shares in AIG awarded to him by SICO as part of the DCPPPs for his years of exemplary service.

16.      Mr. Greenberg was damaged by Defendants' material misrepresentations and omissions by virtue of the fact that the shares he acquired in January 2008 at an artificially inflated price subsequently lost almost all of their value when the true facts about AIG's financial condition were disclosed to the market. The artificially inflated price of AIG stock, resulting from Defendants' material misrepresentations and omissions, also caused Mr. Greenberg to pay over $70 million in tax based on the inflated value of the AIG shares he acquired in that year.

## JURISDICTION AND VENUE

17.     This action arises under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

18.     This Court has subject-matter jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1367.

19.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391.  Many of the false and misleading statements were made in or issued from this District.  Moreover, AIG is headquartered in this District, and substantially all of the Defendants reside, conduct business, or maintain offices in this District.

20.     In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange and market.

## PARTIES

21.     Mr. Greenberg is the largest non-institutional holder of AIG stock.  According to the SEC Form 5 filed on February 12, 2009, Mr. Greenberg may be deemed to beneficially own more than 10% of the common stock of AIG.  Mr. Greenberg is a Florida resident.

22.     Mr. Greenberg was the Chief Executive Officer and a Director of AIG between 1967 and 2005.  From 1967 to March 2005, Mr. Greenberg was the CEO of AIG, and he was AIG's President between 1967 and 1991.  From 1989 to March 2005, he was also the Chairman of AIG's Board of Directors.  Mr. Greenberg has also served as a voting shareholder of SICO from at least 1968 to the present, and as a Chairman of SICO's Board of Directors since October

1970. Since 1965, Mr. Greenberg has been a Director of C.V. Starr & Co., Inc. ("C.V. Starr"), and since at least 1970, he has been Chairman and CEO of C.V. Starr.

23.     Defendant AIG is a Delaware corporation with its principal place of business in New York, New York.

24.     Defendant Martin J. Sullivan was the President and Chief Executive Officer of AIG. He is a resident of the State of New York.

25.     Defendant Steven J. Bensinger was the Chief Financial Officer of AIG. He is a resident of the State of New York.

26.     Defendant Stephen F. Bollenbach is an AIG Director and a member of the Audit Committee of the AIG Board of Directors. He is a resident of the State of California.

27.     Defendant Joseph Cassano was the Chief Executive Officer of AIG Financial Products ("AIGFP"), a wholly owned subsidiary of AIG, until he announced his resignation in February 2008. After his resignation, Defendant Cassano was retained as a consultant to AIG at a reported salary of $1,000,000.00 per month. He is a resident of the State of Connecticut.

28.     Defendant George L. Miles, Jr. is an AIG Director and a member of the Audit Committee of the AIG Board of Directors. He is a resident of the State of Pennsylvania.

29.     Defendant Morris W. Offit is an AIG Director and a member of the Audit Committee of the AIG Board of Directors. He is a resident of the State of Connecticut.

30.     Defendant Michael H. Sutton is an AIG Director and a member of the Audit Committee of the AIG Board of Directors. He is a resident of the State of Virginia.

## FACTUAL ALLEGATIONS

**A.     SICO's Creation of the DCPPP**

31.     In early 1975, SICO established its first Deferred Compensation Profit Participation Plan (the "1975-1976 DCPPP"). The 1975-1976 DCPPP, like subsequent DCPPPs, was designed to provide deferred incentive compensation to select employees of SICO, American International Reinsurance Company, Inc. ("AIRCO"), and AIG, among several other companies. The 1975-1976 DCPPP, like all subsequent DCPPPs, was in writing and approved by SICO's voting shareholders. Its purpose was to assure SICO's growth.

32.     The 1975-1976 DCPPP, and subsequent DCPPPs, contingently set aside a specified number of AIRCO or AIG shares for participants based upon the number of DCPPP units they had been granted. Each subsequent two-year DCPPP was at the sole discretion of SICO and required the separate consideration and vote of the voting shareholders of SICO.

33.     Until a DCPPP participant received any shares that had been contingently set aside by SICO for the participant, SICO continued to vote and receive dividends on those shares; the participant had no ownership rights in the contingently set-aside shares.

34.     The awards were generally payable upon a participant's retirement after reaching age 65, at which time all of the remaining shares would vest. Shares would generally be forfeited if a participant ceased employment with AIG, AIRCO, SICO, or another designated company prior to vesting of those shares.

35.     SICO offered a total of 15 separate DCPPPs between 1975 and 2005.

**B.     Mr. Greenberg's Acquisition of AIG Shares From the DCPPPs**

36.     Mr. Greenberg was awarded DCPPP units and AIG shares were contingently set aside for him pursuant to fourteen DCPPP plans: all plans between 1975-76 and 2003-04, except

for the 1983-84 plan, under which no AIG shares were contingently set aside for any participants.

37.     In the aggregate, Mr. Greenberg was awarded DCPPP units entitling him to acquire approximately 3,680,759 AIG shares, as follows:

| Plan Year | DCPPP Units Awarded | AIG Shares Represented by DCPPP Units |
|-----------|---------------------|----------------------------------------|
| 1975 | 10,000 | 305,900.78 |
| 1977 | 10,000 | 355,957.04 |
| 1979 | 8,500 | 196,666.32 |
| 1981 | 7,500 | 137,933.39 |
| 1983 | 7,500 | 0 |
| 1985 | 7,500 | 177,978.53 |
| 1987 | 7,500 | 227,812.50 |
| 1989 | 7,500 | 94,684.59 |
| 1991 | 8,500 | 290,460.69 |
| 1993 | 8,500 | 537,890.63 |
| 1995 | 10,000 | 421,875.00 |
| 1997 | 10,000 | 300,000.00 |
| 1999 | 10,000 | 288,000.00 |
| 2001 | 10,000 | 192,000.00 |
| 2003 | 8,000 | 153,600.00 |

38.     On or about December 20, 2007, Mr. Greenberg elected to receive his entire DCPPP award from SICO in the form of AIG shares.

39.     By the time Mr. Greenberg elected to receive his DCPPP award, he had already

rendered about 40 years of service to SICO, C.V. Starr, AIG, and their predecessor companies.

40.     On or about January 30, 2008, Mr. Greenberg received approximately 3,680,759

AIG shares from SICO.  At the market close on January 30, 2008, AIG's stock traded at or about

$54.37 per share.

41.     The shares received by Mr. Greenberg were taxed as ordinary income, totaling

over $200 million.  As result, Mr. Greenberg paid over $70 million in ordinary income tax based

on the acquisition of these shares.

**C.     AIG's Creation of AIGFP**

42.     AIG created AIGFP in 1987 to diversify its earnings.  In 1998, AIGFP began

selling CDS.  While Mr. Greenberg was AIG's CEO, AIG management monitored AIGFP and

its risk portfolio very closely through numerous internal risk controls, including independent and

outside monitoring.  Between 1998 and March 2005, only a handful of CDS written by AIGFP

had any subprime mortgage exposure.

**D.     AIG's Status When Mr. Greenberg Retired**

43.     Mr. Greenberg led AIG for more than 35 years until his retirement as Chairman

and CEO in early 2005.  Under Mr. Greenberg's stewardship, AIG grew from a modest

enterprise into the largest and most successful insurance company in the world.  Its market

capitalization increased approximately 40,000 percent between 1969, when AIG went public,

and 2004, Mr. Greenberg's last full year as Chairman and CEO.  AIG opened markets for U.S.

businesses all over the world, and contributed significantly to U.S. gross domestic product.

44.     Under Mr. Greenberg's leadership of AIG, the CDS portfolio was accounted for

at market value, in accordance with Financial Accounting Statement ("FAS") 133.  In his

testimony before the House of Representatives Committee on Oversight and Government Reform (the "Oversight Committee"), given on October 4, 2008, Mr. Joseph W. St. Denis, who had served as Vice President of Accounting Policy at AIGFP between June 2006 and October 1, 2007, stated that historically, the CDS portfolio had been accounted for at market value under FAS 133. Until the summer of 2007, AIGFP's CDS portfolio was in an aggregate unrealized gain position with no-mark-to-market adjustments due to the fact that there was no active market for these instruments. The portfolio's value was traditionally monitored through the use of a value-at-risk model, which tracked changes in credit ratings of the underlying collateral.

45.     Before Mr. Greenberg's retirement in 2005, AIGFP reported directly to him and Ed Matthews, Senior Vice Chairman, and later to William Dooley, Senior Vice President. The oversight of AIGFP was also supported by AIG's credit risk and market risk departments. AIGFP was subject to numerous internal risk controls, including credit risk monitoring by several independent units of AIG, review of AIGFP transactions by outside auditors and consultants, and scrutiny by AIGFP's and AIG's Boards of Directors. Every new type of transaction or any transaction of a certain size, including most CDS, had to pass review by AIG's Chief Credit Officer.

**E.      The Change In AIG's Oversight of Risk**

46.     Subprime mortgages are residential home loans extended to borrowers who, pursuant to certain underwriting guidelines, do not qualify for "first tier" interest rates. These underwriting guidelines typically include a variety of factors, including the borrower's credit history, income, assets, and amount of equity in the residential property. Subprime mortgages carry higher interest rates because of their increased risk and higher rate of default.

47.     AIG participates in the U.S. residential mortgage market in various ways:  (1) AIG, through its subsidiary American General Finance, originates mortgages, including subprime mortgages; (2) AIG insurance and financial services subsidiaries invest in mortgage-backed securities and CDOs in which the underlying collateral is composed in whole or in part of residential mortgage loans; and (3) AIGFP provides credit protection through CDS on certain senior tranches of such CDOs.

48.     Banks and other financial institutions, including AIG, securitize subprime mortgages into various securities, including CDOs, which they then sell to investors or warehouse for later sale.

49.     To hedge the exposure to the risk of their investment in CDOs and other debt securities, investors in these securities bought CDS, which obligate the issuer of the CDS to make payments to the holder of the CDS in the event of a failure to pay or other credit event in respect of the underlying debt.  Even prior to the maturity of such payment obligations, the issuer of such CDS may be required to make payments of collateral support, or margin, as the prices of the underlying debt instruments decrease.

50.     After Mr. Greenberg left AIG, AIGFP's volume of CDS exploded, most of which involved CDOs exposed to subprime mortgages.  As of December 31, 2007, AIG, through its wholly owned subsidiary AIGFP, was counterparty on CDS hedging the default risk for at least $527 billion in debt, including over $78 billion in CDOs.  In all, as of September 15, 2008, AIG wrote about $79 billion in insurance in CDOs whose collaterals were mainly subprime mortgages.

51.     In addition, after March 2005, risk controls over AIGFP portfolio were weakened or eliminated.  For example, Defendant Sullivan ceased conducting weekly meetings that Mr. Greenberg had used to review all of AIG's investments and risks.

52.     Despite AIG's mantra that there could never be losses on its CDS portfolio, in September 2007, AIGFP received a multi-billion dollar margin call on certain of the super senior CDS because at least one counterparty's valuation model indicated that AIGFP was in a potentially material liability position.  AIG then expended efforts to value the portfolio. Defendant Cassano informed Mr. St. Denis that he had "deliberately excluded" Mr. St. Denis from the valuation process because Defendant Cassano was concerned that Mr. St. Denis' efforts to bring transparency to the accounting policy process at AIGFP "would pollute the process."

53.     In addition, Defendant Cassano took other actions to prevent Mr. St. Denis from performing his duties and injecting transparency into the accounting process at AIG.  For example, in AIGFP's investment in Tenaska, a natural gas operation in Nebraska, Mr. St. Denis raised certain issues in relation to the pre-transaction accounting.  Defendant Cassano berated Mr. St. Denis for finding closing accounting problems with the transaction, emphasizing that his loyalty should be to Defendant Cassano, not to AIG's Financial Services Division ("FSD") or the Corporate Office of Accounting Policy (the "OAP").

54.     As another example, after Mr. St. Denis refused to provide assurances that AIGFP would not be required to consolidate a structured investment vehicle called Nightingale onto its balance sheet if AIGFP were to purchase all of the outstanding debt of the vehicle, Mr. St. Denis was instructed to report to the controller of AIGFP, and to be isolated from OAP and FSD accounting policy personnel.  Despite his stellar job performance review given by Defendant

Cassano in June 2007, the new organizational structure in effect demoted Mr. St. Denis, prompting his resignation in September 2007.

55.    After Mr. St. Denis' resignation, William Kolbert, Executive Vice President and Chief Administrative Officer of AIGFP, immediately pleaded with Mr. St. Denis to return, blaming the new organizational structure on a clerical error.  Defendant Cassano assured him that he would have access to AIG's corporate accounting policy personnel, although he would be reporting to OAP.

56.    Two weeks after Mr. St. Denis returned to AIGFP, Defendant Cassano again criticized him for his valuation of the structured investment vehicle, which was in accordance with the OAP's approach.  After shouting at Mr. St. Denis, Defendant Cassano stated again that he had "deliberately excluded" Mr. St. Denis from valuing the CDO portfolio due to his concerns that Mr. St. Denis "would pollute the process."  In light of this further attempt by Defendant Cassano to isolate Mr. St. Denis from OAP and FSP personnel and to exclude him from CDO portfolio valuation, Mr. St. Denis resigned on October 1, 2007.  After his resignation, Michael Roemer, AIG's Chief Auditor, contacted Mr. St. Denis.  After learning the details surrounding Mr. St. Denis' resignation, Mr. Roemer recognized that Mr. St. Denis had been "painted into a corner" by Defendant Cassano.  The PwC engagement partner on AIGFP also contacted Mr. St. Denis to inquire about his reasons for leaving AIGFP.

57.    After the margin call in September 2007, AIGFP developed a "Binomial Expansion Technique" model to value and account for the CDO portfolio.  AIG's Controller, internal audit personnel, and Director of OAP were involved in the process.  Defendant Cassano represented to this group that this model established that the CDS portfolio continued to be in an aggregate unrealized gain position.

14

F.     **The Subprime Debt Crisis and AIG's Repeated Material Misrepresentations and Omissions of Its Subprime Exposure**

58.     In early- to mid-2007, the rate of default on subprime mortgages was rising rapidly.  This rising default rate led the investors to be concerned about AIG's exposure to subprime mortgages and the CDS worth hundreds of billions of dollars that AIG had sold.  On August 1, 2007, MarketWatch reported that "AIG shares dropped more than 8% in July as investors worried the giant insurer could be hit by losses from declines in the value of subprime mortgages" and quoted Paul Newsome, an analyst at A.G. Edwards, as reporting "AIG's shares have fallen significantly in past days.  Why we don't exactly know, but investors are telling us that it has something to do with the potential for AIG to suffer significant losses from subprime mortgages."

59.     AIG undertook a concerted effort to mislead Plaintiff and the investing public generally about AIG's subprime exposure.

60.     On August 9, 2007, in its second quarter 2007 earnings call with investors, AIG repeatedly attempted to reassure the investing public about AIG's exposure to the risk of loss from its portfolio of CDS, stating (emphasis added):

- AIGFP's exposure to the market is derived through two sources. First, they write extremely risk-remote super senior or AAA-plus credit protection on highly-diversified pools of assets, some of which include residential mortgages. Second, they are cash investors in highly-rated securities where some portion of the underlying collateral, which may include collateral from many sectors, includes residential mortgages. **While both of these activities involve significant notional exposure, the risk actually undertaken is very modest and remote, and has been structured and managed effectively**.

    AIGFP has been running a successful business of writing super senior credit default swaps, or CDS protection, since 1998. As of June 30 this year, they had a total net CDS exposure across all asset classes of $465 billion. The super senior portion is the least likely to incur any losses in these deals, since losses are allocated on a sequential basis from lowest to highest quality. Before AIGFP would be at risk for its first dollar of loss, these structures would have to

experience exceptional losses that eroded all of the tranches below the super senior level, including a very significant AAA layer of protection.

- AIG's Financial Products portfolio of super senior credit default swaps is well structured; undergoes ongoing monitoring, modeling, and analysis; and enjoys significant protection from collateral subordination. Certainly, we will be following this market closely during this period of volatility and correction, and we will continue to manage these risks carefully.

- It is hard to get this message across but these [CDS] are very much handpicked. We are very much involved in the process of developing the portfolios in which we are going to wrap, and then picking the attachment points. People have been willing to work with us in order to do that, to create the value that they do in these underlying [assets]. So the combination of the diversity, the combination of the underlying credit quality, and then the stresses that we put it through to make sure that we can hit these marks **it is hard for us with, and without being flippant, to even see a scenario within any kind of realm of reason that would see us losing $1 in any of those transactions.**

- We wanted to make sure in this presentation, we broke out exactly what everything looked like in order to give everybody the full disclosure. **But we see no issues at all emerging. We see no dollar of loss associated with any of that [CDS] business. Any reasonable scenario that anyone can draw, and when I say reasonable, I mean a severe recession scenario that you can draw out for the life of those securities.**

61.    Representatives of Mr. Greenberg attended the August 9, 2007 call telephonically and reviewed the materials that were presented during the call.

62.    *The Wall Street Journal* reported on AIG's reassurances on August 13, 2007 in an article entitled "In Subprime, AIG Sees Small Risk; Others See More":

> Exotic financial instruments linked to subprime mortgages are showing huge losses in debt markets and weighing on companies from lenders to banks to insurers.  But not at American International Group Inc. – or so its executives say.
>
> The insurance giant did its best to reassure markets late last week that it wasn't going to get slammed by the crisis gripping mortgage and debt markets.  Although AIG sees mortgage delinquencies rising, executives said during an earnings conference call that the bulk of its mortgage insurance and residential loans aren't at risk.
>
> The company also said it didn't see problems related to a kind of insurance contract, or derivative, it has written against financial instruments that include

some subprime debt.  AIG based its all-clear signal for those derivatives on the fact that its internal models show that losses are extremely remote in the portions of the investment vehicles it's insuring.  No likely losses means no reason to worry, the company reasoned.

* * *

Stock analysts seem satisfied by the company's response that there isn't a problem. . . .

63.     In its Form 10-Q, filed on November 7, 2007, AIG again misrepresented its positions to investors regarding its exposure to the subprime debt crisis, claiming that AIG "continues to believe that it is highly unlikely" that AIGFP would have to make payments related to its CDS portfolio.  In a related November 8, 2007 earnings conference call, AIG again reassured investors that the risk associated with its large CDS portfolio was "remote."  At the time, AIG's CEO, Defendant Sullivan, also told investors:  "While U.S. residential mortgage and credit market conditions adversely affected our results, our active and strong risk management processes helped contain the exposure."

64.     AIG's Form 10-Q filed on November 7, 2007 specifically misrepresented that AIG's CDS portfolio lost a relatively small amount in value, or $352 million, during the third quarter of 2007 and estimated a relatively small $550 million in additional losses during October 2007.

65.     Representatives of Mr. Greenberg attended the November 7, 2007 third-quarter 2007 earnings call telephonically and reviewed the materials that were presented during the call.

66.     The truth, which Defendants knew or recklessly disregarded at the time of AIG's issuance of its third quarter 2007 Form 10-Q, but concealed from the investing public until at least February 2008, was as follows:

(a)     The relatively modest losses for September and October 2007 reported by AIG in its CDS portfolio were calculated using an inadequate valuation model based on generic credit spreads on asset-backed securities provided by a third party rather than a more appropriate valuation model based on cash bond prices provided by the managers of the underlying CDO collateral pools or prices derived from a price matrix based on cash bond prices that were available; and

(b)     AIG's reported losses in its CDS portfolio would have been substantially higher had AIG utilized the more appropriate market-based valuation model instead of relying on unreliable "generic" credit spreads.

67.     Defendants Sullivan and Bensinger each signed AIG's third-quarter 2007 Form 10-Q, including a certification that, based on their knowledge, (i) the Form 10-Q did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading;" and (ii) "the financial statements, and other financial information included in" the Form 10-Q "fairly present[ed] in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in" the Form 10-Q.  Defendants Sullivan and Bensinger also each certified in the Form 10-Q for the third quarter of 2007 that they had "[d]esigned such internal controls over financial reporting, or caused such internal control over financial reporting to be designed under [their] supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

68.      Upon information and belief, AIG's Audit Committee of its Board of Directors, composed of Defendants Bollenbach, Miles, Offit, and Sutton, reviewed and discussed with AIG's management and external auditors AIG's third-quarter 2007 Form 10-Q and third-quarter 2007 earnings releases prior to their public disclosure.  Pursuant to its charter, the Audit Committee has the obligation to discuss with management, AIG's internal auditors, and AIG's independent auditor any major issues regarding accounting principles and financial statement presentations, including any significant change in AIG's selection and application of accounting principles.  AIG's Audit Committee met fourteen times in 2007, averaging more than one meeting per month.  Upon information and belief, the AIG Audit Committee was directly involved in financial disclosures AIG made to Mr. Greenberg and other investors regarding losses in its CDS portfolio.

69.      Approximately one month after the disclosures in the third-quarter 2007 Form 10-Q, AIG held an investor meeting (the "December 5 Investor Meeting"), which was attended by a representative of Mr. Greenberg, to discuss its exposures to the U.S. residential mortgage market in greater detail.  AIG provided information about its results prior to its fourth-quarter earnings announcement, in light of the extreme market conditions in the residential mortgage market in the prior two months.

70.      At the December 5 Investor Meeting, and as later memorialized in its Form 8-K/A filed with the SEC on December 7, 2007 (the "December 7 Form 8-K"), AIG disclosed that the value of its super senior credit derivative portfolio had declined between $1.05 and $1.15 billion since October 31, 2007.  Taking the disclosures of these losses together with the prior disclosures of losses in the third-quarter Form 10-Q, investors were led by AIG to believe that the total

disclosed decline in value of AIG's super senior credit derivative portfolio through November 2007 was only between $1.4 and $1.5 billion.

71.     In addition to these specific financial disclosures, at the December 5 Investor Meeting, AIG reiterated its assurances that its CDS portfolio posed only a "remote" risk. Defendant Sullivan also told investors that the possibility that AIGFP, which issued the CDS, would sustain a loss was "close to zero" and that AIG is "confident in [its] marks and the reasonableness of [its] valuation methods." Defendant Sullivan stated that AIG had "a high degree of certainty in" the losses that AIG had "booked to date," and that AIG's "U.S. residential housing exposures are manageable given AIG's size, financial strength and diversified global business." Defendant Sullivan assured investors that AIGFP's models "have proven to be very reliable" and "provide AIG with a very high level of comfort." The "bottom line" that Defendant Sullivan said he hoped those in attendance would take away from the meeting was that "AIG has accurately identified all areas of exposure to the U.S. residential housing market." Defendant Sullivan made these predictions despite serious concerns raised a week earlier by PwC about the accounting treatment of CDOs and "a material weakness in the internal control over financial reporting related to the AIGFP super senior credit default swap portfolio valuation process and oversight thereof."

72.     At the December 5 Investor Meeting, Defendant Cassano also touted the strength, quality, and conservative nature of the model AIG had used to estimate the fair value of its CDS portfolio.   Defendant Cassano stated that "we always model to a worst-case scenario . . . and we always model to a 99.85% confidence level." Defendant Cassano further described the process by which AIG selected and modeled CDS, in the following terms:

> So just to sum up before the Q&A, we believe this is a [good money] portfolio. You've heard us talk about all our trades combine the strength and careful asset

due diligence, selection and review with the rigors and frameworks provided by our bespoke modeling.

But each and [every one] of our transactions . . . passes through the same careful process, we don't have any shortcuts, including . . . the approval of the AIG Head Office Enterprise Risk or the Credit Risk Group at AIG.  So [there are] always two eyes, two teams reviewing our business.  There is not one dollar of this business that's been done that hasn't gone through that double review check.

. . . [T]he models we use are simple, they're specific and they're highly conservative.  And other than the accounting methodology model, they're all in-house models.  And we actually went outside to draw down a model that was publicly available for accounting valuations because it was easy for others then to look and understand what we're doing, because that's the whole essence of the fair value[, which] is let others see into your business.

73.     Representatives of Mr. Greenberg attended the December 5, 2007 Investor Meeting telephonically and reviewed the materials that were presented at the meeting as well as the December 7 Form 8-K.

74.     AIG's material misrepresentations and omissions made to the investing public on December 5 had their intended effect.  In the previous six months, AIG's stock had fallen approximately 23%.  But, as *The Wall Street Journal's* MarketBeat Blog reported on December 5, AIG's "stock was the leading Dow component out of the gate, opening at $58 a share, up $2.55, or 4.6%, from Tuesday's $55.45 close.  The rally was bolstered by statements from company executives during today's session that its exposure to housing is 'manageable,' and that it has no exposure to structured investment vehicles, which hold a big load of the odorous mass known as collateralized debt obligations. . . .  Of course, the markets have heard this sort of thing before – losses expected to be contained weren't; exposures that looked healthy were less so – but saying one has no exposure, that's a bit more definitive."

75.     The true facts, which Defendants either knew or recklessly disregarded at the time of the December 5 Investor Meeting and the December 7 Form 8-K but concealed from Mr. Greenberg and the investing public until at least February 2008, were as follows:

(a)     AIG's actual losses in its super senior credit derivative portfolio in October and November 2007 were more than *4 billion greater* than AIG disclosed to investors at the December 5 Investor Meeting and in the December 7 Form 8-K;

(b)     AIG hid its true losses in its super senior credit derivative portfolio in October and November 2007 by netting against those losses $4.36 billion in offsets from supposed "cash flow diversion features" and "negative basis adjustments," which netting was never disclosed to investors at the December 5 Conference or in the December 7 Form 8-K or otherwise;

(c)     All of the more than $3.6 billion in "negative basis adjustments" and more than 50% of the cash flow diversion features that AIG used to hide its true losses in its super senior credit derivative portfolio in October and November 2007 were unjustifiable; and

(d)     At the time of its disclosure of losses in its super senior credit derivative portfolio at the December 5 Investor Meeting and in the December 7 Form 8-K, AIG had a "material weakness" in its internal controls over financial reporting related to the fair values for the swaps in this portfolio.

**G.    AIG Reveals the Truth About Its Losses in 2007 Relating to the Subprime Debt Crisis**

76.    In its Form 8-K filing with the SEC filed on February 11, 2008 (the "February 11 Form 8-K"), AIG recognized that it needed to correct the prior information that it had provided to investors regarding the losses in its credit swap portfolio.

77.    First, the February 11 Form 8-K acknowledged that AIG's gross cumulative loss on its CDS portfolio through November 30, 2007 was actually $5.96 billion, more than $4 billion greater than the net figure reported to investors in December 2007.

78.    Second, the February 11 Form 8-K acknowledged that, in its December 2007 disclosures, AIG had, for the first time, netted its losses in its CDS portfolio against "cash flow diversion features" and "negative basis adjustments."  Specifically, AIG told investors that prior to the December disclosures, it had concluded that it could not reliably estimate the value of the "cash flow diversion features" so it did not apply these features in determining the value of its CDS portfolio in the third quarter of 2007, or in October 2007.  But, faced with enormous gross losses at the time of the December 5 Investor Meeting, AIG claimed it was, for the first time, in a position to apply these features on a net basis to reduce its reported losses by $732 million.  The February 11 Form 8-K also acknowledged that, in its December 2007 disclosures, AIG for the first time began to net its losses in its CDS portfolio against $3.63 billion in what it called "negative basis adjustments," a term not even mentioned in discussing the value of AIG's CDS portfolio in the third-quarter Form 10-Q.  In all, AIG disclosed that giving effect to the purported benefit of the cash flow diversion features and negative basis adjustment in its December disclosures, AIG reduced the amount of the "gross losses" from $5.964 billion to the $1.4 to $1.5 billion in October and November 2007 that AIG disclosed to investors in its December 7 Form 8-K.

79.     Third, the February 11 Form 8-K acknowledged that in its forthcoming 2007 Form 10-K, AIG had decided that it did not have a basis to apply the $3.63 billion "negative basis adjustment" that AIG had used in its December disclosures to reduce dramatically its reported losses in its CDS portfolio.

80.     Fourth, the February 11 Form 8-K acknowledged that the calculation of the September and October losses reported in AIG's third-quarter 2007 Form 10-Q for its super senior credit derivative portfolio was based on "generic" valuation inputs rather than the observed market-based inputs that AIG later adopted to calculate its losses utilizing "cash bond prices provided by managers of the underlying CDO collateral pools, or where not provided by the managers, prices derived from a price matrix based on cash bond prices that were provided." AIG further acknowledged that the kind of "generic" valuation methodology that was the basis of its loss disclosures in AIG's third-quarter 2007 Form 10-Q resulted in dramatically lower loss calculations as compared to the market-based valuation method that AIG later adopted.  In particular, AIG acknowledged that its reported gross loss through November 30, 2007 would have been *57 percent less* if AIG had relied on a "generic" valuation methodology.

81.     Finally, the February 11 Form 8-K acknowledged that AIG had been advised by its independent auditors, PwC, that they had "concluded that at December 31, 2007, AIG had a material weakness in its internal control over financial reporting and oversight relating to the fair value valuation of the AIGFP super senior credit default swap portfolio."

82.     As a consequence of the disclosures of AIG's previous misrepresentations and omissions, on February 11, 2008, AIG's stock fell by the highest percentage in a single day in 20 years.

83.     On February 28, 2008, AIG filed its 2007 Form 10-K (the "2007 Form 10-K")
and further confirmed that its prior disclosures regarding its losses on its CDS portfolio had been
false and misleading.

84.     In the 2007 Form 10-K, AIG disclosed that during 2007 the value of its CDS
portfolio had dropped *$11.5 billion* and, as a consequence, AIG reported its largest-ever
quarterly loss of $5.3 billion.  AIG also reported that it lost about $3 billion in its investment
portfolio because of losses in its portfolio of mortgage debt.  In connection with reporting these
results, Defendant Sullivan told investors that the subprime crisis had thrown AIG into
"uncharted waters."  Defendant Sullivan also announced that Defendant Cassano, head of
AIGFP, the entity responsible for the CDS portfolio, had agreed to leave AIG.  Defendant
Sullivan then acknowledged that "AIG's results in 2007 were clearly unsatisfactory" and that
even more losses were possible, stating:  "During 2008, we expect the U.S. housing market to
remain weak and credit market uncertainty will likely persist.  Continuing market deterioration
would cause AIG to report additional unrealized market valuation losses and impairment
charges."

85.     In its 2007 Form 10-K, filed on February 28, 2008, and the fourth-quarter 2007
earnings call on February 29, 2008, AIG also conceded that the offsets it had previously made to
reduce its reported losses were improper, and AIG later reduced or eliminated them from its loss
calculations.  In particular, AIG conceded in its 2007 Form 10-K that it did not have a reason to
apply the $3.63 billion in negative basis adjustments that AIG had used in its December 7
disclosures to reduce its reported decline in value of its CDS portfolio.

86.     AIG also conceded in its fourth-quarter 2007 earnings call on February 29, 2008
that the amount of cash flow diversion features that AIG used in its December 7 and February 11

disclosures to reduce its reported decline in value of its CDS portfolio was improper. The materials for that conference call make clear that AIG had reduced this offsetting amount to only $310 million – a 58% reduction from the offset for such features that AIG used in its December 7 and February 11 Form 8-Ks.

87.    In its 2007 Form 10-K, AIG also disclosed for the first time that its CDS portfolio included $6.5 billion in liquidity puts that it had written on CDOs linked to subprime residential mortgages. Under the terms of these put agreements, AIGFP is required to purchase the CDOs under certain circumstances at par, so long as the securities have not experienced a default. In the 2007 Form 10-K, AIG also acknowledged for the first time that it had repurchased $754 million of these securities in 2007, and that it had provided third-parties with $3 billion in liquidity facilities in case AIGFP was required to repurchase additional CDOs over the next three years. Through these disclosures, AIG showed that it knew of its exposure to the subprime market via these liquidity puts at the December 5 Investor Meeting and earlier, but failed to inform investors at that time of its actual and potential losses from these puts.

88.    AIG's 2007 Form 10-K also includes a letter from PwC, setting forth PwC's view that AIG's internal controls, which are essential to providing reasonable assurance of the reliability of financial reporting, had a material weakness and were ineffective (emphasis added):

> Also in our opinion, **AIG did not maintain, in all material respects, effective internal control over financial reporting** as of December 31, 2007, based on criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) **because a material weakness in internal control over financial reporting related to the AIGFP super senior credit default swap portfolio valuation process and oversight thereof existed as of that date.** A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis.

\* \* \*

**A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.** A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

89.     AIG's 2007 Form 10-K further recognizes that AIG agreed with its auditors' assessment, that AIG's disclosure controls and procedures were ineffective as of December 31, 2007.  AIG specifically conceded that its "controls over the AIGFP super senior credit default swap portfolio valuation process and oversight thereof were not adequate to prevent or detect misstatements in the accuracy of management's fair value estimates and disclosures on a timely basis, resulting in adjustments for purposes of AIG's December 31, 2007 consolidated financial statements."

90.     In particular, AIG acknowledged (emphasis added):

During the evaluation of disclosure controls and procedures as of December 31, 2007 conducted during the preparation of AIG's financial statements to be included in this Annual Report on Form 10-K, **a material weakness in internal control over financial reporting relating to the fair value valuation of the AIGFP super senior credit default swap portfolio was identified**.  As a result of this material weakness, described more fully below, AIG's Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2007, **AIG's disclosure controls and procedures were ineffective**.

\* \* \*

Management of AIG is responsible for establishing and maintaining adequate internal control over financial reporting. AIG's internal control over financial

reporting is a process, under the supervision of AIG's Chief Executive Officer and Chief Financial Officer, **designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of AIG's financial statements for external purposes in accordance with GAAP.**

\* \* \*

As of December 31, 2007, controls over the AIGFP super senior credit default swap portfolio valuation process and oversight thereof were not effective. **AIG had insufficient resources to design and carry out effective controls to prevent or detect errors and to determine appropriate disclosures on a timely** basis with respect to the processes and models introduced in the fourth quarter of 2007. As a result, AIG had not fully developed its controls to assess, on a timely basis, the relevance to its valuation of all third party information. Also, **controls to permit the appropriate oversight and monitoring of the AIGFP super senior credit default swap portfolio valuation process, including timely sharing of information at the appropriate levels of the organization, did not operate effectively. As a result, controls over the AIGFP super senior credit default swap portfolio valuation process and oversight thereof were not adequate to prevent or detect misstatements in the accuracy of management's fair value estimates and disclosures on a timely basis,** resulting in adjustments for purposes of AIG's December 31, 2007 consolidated financial statements. In addition, **this deficiency could result in a misstatement in management's fair value estimates or disclosures that could be material to AIG's annual or interim consolidated financial statements that would not be prevented or detected on a timely basis.**

### H. Defendants' Fraud Led to Massive Losses of Value for AIG Shareholders, But Despite the Losses, Defendant Sullivan Leaves AIG with a Large Severance Package

91.    As a consequence of the February 11 disclosure of nearly $6 billion in "gross" losses to its CDS portfolio, AIG's stock plummeted on the heaviest trading day in its history, from a close of $50.68 on Friday, February 8 to a close of $44.74 on Monday, February 11, a single-day drop of $5.94, or 11.7%, representing a loss of about $15 billion in market capitalization.

92.    As a consequence of the February 28 disclosure of $11.5 billion in losses to its credit default swap portfolio, AIG's stock dropped from a close of $52.25 on February 27 to a close of $46.86 on February 29, 2008.

93.     In early March 2008, the Office of Thrift Supervision, which regulates AIG's holding company, sent a letter to AIG to express its concerns that the corporate oversight of AIGFP was not independent, transparent, or granular.  Concurrently, PwC again reported to AIG similar problems, informing AIG's audit committee that the root of AIG's problems related to its risk control groups not having sufficient access to AIGFP.  Neither one of these events was disclosed in AIG's public filings.  Moreover, during a meeting of the compensation committee of AIG's Board of Directors that month, Defendant Sullivan urged exclusion of money-losing AIGFP's operation results when calculating AIG executives' bonuses.

94.     On Thursday, March 13, 2008, AIG's stock dropped by as much as 8% due to additional concerns that AIG could face larger-than-expected losses from its CDS portfolio.  Morgan Stanley analyst Nigel Dally said, "AIG believes economic losses from its (credit default swap) exposures are unlikely to exceed $900 million.  However, our analysis suggests losses of $3 billion, with downside to more than $13 billion if the fixed income crisis deepens."  Dally also stated:  "If the fixed income crisis deepens, these losses, coupled with escalating credit losses and lower earnings from segments exposed to the residential housing crisis, could lead to a capital shortfall at" AIG.  AIG's stock closed down 2.7% on March 13, 2008.  On Monday, March 17, 2008, AIG's stock price reached a then all-time low of $38.50 and closed down 3.4% for the day at $39.80.

95.     In an article published on June 6, 2008, entitled "SEC, Justice Scrutinize AIG on Swaps Accounting," *The Wall Street Journal* reported that the Securities and Exchange Commission ("SEC") had initiated an investigation concerning whether AIG had overstated the value of contracts linked to subprime mortgages.  According to the article, "[a]t issue is the way

the company valued credit default swaps, which are contracts that insure against default of securities, including those backed by subprime mortgages."

96.     In the same article, *The Wall Street Journal* also reported that criminal prosecutors from the Department of Justice ("DOJ") in both Washington, D.C. and New York had informed the SEC that they want information that the SEC is gathering in connection with this investigation. According to the report, "[t]hat means a criminal investigation could follow."

97.     In the wake of these reports, AIG's stock price plummeted another 6.8% in a single day.

98.     On or about June 9, 2008, AIG spokesman Chris Winans was quoted as saying that the DOJ and SEC inquiries were received some time after AIG filed a notice with the SEC on February 8, 2008 that its auditors had reported a material weakness in AIG's valuation of its CDS portfolio. Thus, it appears that AIG knew of these investigations for months but failed to disclose them to the investing public, including Mr. Greenberg.

99.     On Thursday, June 12, 2008, in an article entitled "AIG's Board Now Comes Under Fire of Dissidents," *The Wall Street Journal* reported that "[a]ngry shareholders at American International Group Inc. are ratcheting up their campaign against the insurer, demanding changes to the board in addition to management changes they sought earlier. The shareholders, former director Eli Broad and fund managers Shelby Davis of Davis Selected Advisers, L.P. and Bill Miller of Legg Mason Inc., said in a letter sent to the board Wednesday that 'significant and immediate changes at both the management and board level are clearly called for.'"

100.     According to a June 13, 2008 *The Wall Street Journal* article entitled "AIG Group Tied to Swaps Draws Focus Of Probes," the SEC and DOJ investigations were focused not only

on AIG's valuation of its CDS, but also on AIG's related disclosures and public statements: "One current focus for the regulators is an elaborate investor presentation held on Dec. 5 at which both AIG Chief Executive Martin Sullivan and former financial-products chief Joseph Cassano tried to assure investors that losses would be minimal."

101.    In a closed-door meeting on Sunday, June 15, 2008, AIG's Board of Directors ousted Defendant Sullivan, replacing him as CEO with Chairman of the Board Robert Willumstad, who had joined AIG's board in 2006.

102.    In connection with his ouster, effective July 1, 2008, Defendant Sullivan received a severance of $15 million, a *pro rata* bonus of $4 million, and the continued vesting of outstanding equity and long-term cash awards valued at approximately $28 million, even though AIG shareholders, including Mr. Greenberg, have lost more than half of the market value of their AIG shares since Defendant Sullivan took over as the CEO in March of 2005.

103.    Within two days of Defendant Sullivan's ouster in the wake of the reported SEC and DOJ investigations, AIG's stock dropped an additional 5.1%, to a then 11-year low.

**I.      AIG Reveals Additional Losses in Second Quarter of 2008 Relating to the Subprime Debt Crisis**

104.    In its Form 10-Q filed with the SEC on August 6, 2008 for the quarterly period ending June 30, 2008 (the "August 6 Form 10-Q"), AIG recognized unrealized market valuation losses of $5.6 billion ($3.62 billion after tax) for the second quarter of 2008 and market valuation losses of $14.7 billion for the first six months of 2008 on AIGFP's super senior CDS portfolio. AIG also reported operating losses of $518 million for the second quarter of 2008 and operating losses of $872 million for the first six months of 2008 from its mortgage guaranty internal reporting unit. This, of course, after AIG had reassured investors that it was difficult to foresee losing even "one dollar."

105.    In its Form 8-K, filed on August 6, 2008, AIG reiterated its losses first disclosed in its August 6 Form 10-Q.  Blaming its losses on the weak U.S. housing market, among other reasons, AIG reported a net loss of $5.36 billion and an adjusted net loss of $1.32 billion for the second quarter of 2008.

106.    In its news release accompanying the disclosure of its results for the second quarter of 2008, AIG also noted that the results included pre-tax net realized capital losses of $6.08 billion arising primarily from other-than-temporary impairment charges on its investment portfolio, which resulted primarily from declines in fair market values of residential mortgage-backed securities.  AIG also acknowledged that, in addition to the $5.88 billion operating loss of its Financial Services group, its Capital Markets group reported a $6.24 billion operating loss related to its super senior CDS portfolio in the second quarter of 2008.  AIG further noted that rating cuts by Standard & Poor's and Moody's could trigger more than $13 billion in collateral calls from CDS holders.

107.    In early August, because of the severity of the situation, AIG considered creating a separate entity to divest its subprime mortgage assets.

108.    As a result of the second quarter of 2008 results and AIG's revelation that it could be hit by large losses on its CDS exposures, AIG's shares fell to $23.84 on August 7, 2008, from $29.09 on August 6, 2008.

**J.    AIG's Near-Collapse in September 2008**

109.    Amid fears of continued turmoil in the mortgage market, on September 12, 2008, AIG shares fell 31%, to $12.14, their lowest point in 15 years.  It was the biggest percentage loss since AIG's public trading began in 1967.  AIG's market value was now 83% below its 52-week high, which had been reached in October 2007, following the false statements and reassurances

by AIG's officers and directors.  During the week of September 8-12, the value of AIG stock had

fallen 45%.  To prevent its collapse, AIG asked the Federal Reserve for a $40 billion bridge loan.

110.    Shares of AIG then dropped an additional 48% to $6.32 after AIG revealed that it

would need up to $40 billion to shore up its balance sheet to prevent a potential downgrade of its

credit ratings, which would force it to provide more collateral or repay the CDS contracts.

AIG's credit ratings were, in fact, downgraded on September 15, 2008.  Moody's, Standard &

Poor's, and Fitch Rating all downgraded AIG by at least two notches, making it more expensive

for AIG to issue debt and more difficult for it to regain the confidence of investors.  As a result,

AIG had to post $14.5 billion in collateral.

111.    AIG stock traded at $3.75 by the market close on September 16, and fell an

additional 45% on September 17, 2008, to $2.05 at the end of the day, after the Federal Reserve

Board agreed to an $85 billion bailout of AIG through a revolving credit facility.  The revolving

credit facility from the Federal Reserve Bank of New York bore interest at three-month LIBOR

plus 8.50%, a 24-month term, and was secured by a pledge of all assets of AIG and of its

material subsidiaries.  AIG issued a warrant to the Federal Reserve that permits it, subject to

shareholder approval, to obtain up to 79.9% of the outstanding common stock of AIG.  From its

2007 high of $70.13 per share, the value of AIG stock had fallen approximately 97%.

112.    In exchange for extending the loan, the government received 100,000 shares of

AIG convertible participating preferred stock, entitling it to control approximately 80% of voting

interest and to receive approximately 80% of any common stock dividend paid.  Because the

government controls a voting block of shares, no vote of common shareholders to authorize the

common shares issuable upon conversion of the government's preferred shares is necessary.

Millions of shareholders formed a shareholder committee to express strong opposition to the

effect of the bailout on AIG and its shareholders. The terms of the bailout came under particular scrutiny after AIG filed conflicting statements with the SEC, on September 18 and 19, 2008, regarding whether shareholder approval of the bailout would be required.

113.    The terms of the bailout required AIG to pay 8.5% interest even on money it did not draw (and 11.5% on all outstanding amounts), encouraging AIG to borrow the entire amount of the loan despite not needing that much capital. The interest charges added up to $1 billion per month. Despite AIG having more than $1 trillion in assets, it was required to engage in a fire-sale of its assets in order to service the loan payment.

114.    On September 18, 2008, pursuant to Treasury Secretary Henry Paulson's instructions, AIG's board of directors terminated CEO Robert Willumstad after five months, and replaced him with Edward M. Liddy as its Chairman and CEO. Mr. Willumstad had received compensation of about $4 million in 2008.

115.    After signing a definitive agreement with the Federal Reserve Bank on September 23, 2008, for the $85 billion credit facility, AIG suspended its declaration of dividends on AIG's common stock. Liddy announced that AIG was "already developing a plan to sell assets, repay the facility, and emerge as a smaller but profitable company. Importantly, AIG's insurance subsidiaries remain strong, liquid and well-capitalized."

116.    To date, AIG has drawn down the entire $85 billion of the loan and will be forced to sell off numerous assets to repay it. That amount is about 60 times AIG's current market capitalization.

117.    Also in September, 2008, AIG altered its executive pay plan to give its senior managers multimillion-dollar bonuses regardless of recent losses. Moreover, Defendant Cassano, the former head of AIGFP, continued to receive a monthly consulting retainer of $1

million until it was terminated the day before the Congressional Oversight Committee hearings in October 2008. He had earned $280 million during his eight years at AIG and received a $34 million bonus when he retired in March of 2008.

118.    On October 8, 2008, the Federal Reserve extended another loan, of approximately $38 billion, to AIG to keep it from having to draw down the bailout loan too quickly. The New York branch of the Federal Reserve agreed to receive $37.8 billion in investment-grade fixed-income securities from AIG in exchange for the cash. This action was taken only two days after Congress publicly berated AIG at an Oversight Committee hearing for wasting money through excessive executive compensation packages and a week-long retreat for top sellers at a St. Regis resort in late September. AIG's share price fell approximately 17% on October 9, 2008 in response to these revelations.

119.    In response to the amounts of compensation and bonuses received by AIG's top executives, New York Attorney General Andrew Cuomo threatened legal action and asked AIG's board of directors to return millions of dollars in "unreasonable" and "outrageous" payments, including a $5 million cash bonus and a $15 million golden parachute paid to Defendant Sullivan and $34 million bonus paid to Defendant Cassano. According to Mr. Cuomo, such extraordinary expenditures violated New York State law pursuant to which a creditor of an undercapitalized company can object to expenditures "made in the absence of fair consideration." Because AIG pays taxes to New York State, it can be considered a creditor of AIG.

120.    On October 16, 2008, AIG announced that David Herzog had been named its new CFO. Under pressure from Mr. Cuomo, AIG stated that it would not make payments (which would have been about $10 million) to the departing CFO, Defendant Bensinger, pending the

outcome of Mr. Cuomo's probe. In addition, on October 22, AIG agreed to suspend payments to its executives from a $600 million bonus fund as well as $19 million payment remaining under its severance contract with Defendant Sullivan.

121.    As the causes of AIG's near-collapse became better understood, on November 3, 2008, *The Wall Street Journal* reported, in an article entitled "Behind AIG's Fall, Risk Models Failed to Pass Real-World Test," that AIG's risk control model failed to take into account the risk that its customers would require more collateral as the credit market's perception of risk tightened. Although AIG's risk models analyzed the likelihood that AIG would be forced to pay off CDS policies insuring bond defaults, they did not analyze the possibility that AIG would have to post collateral in the event of the decline in value of bonds that had yet to default – despite the fact that AIG was contractually obligated to do so.

122.    During AIG's investor call on October 3, 2008, AIG remained optimistic about its ability to "refocus" its traditional strengths in property and casualty underwriting and to rely on its leading market positions in several businesses. Mr. Liddy indicated AIG's intent to retain domestic property and casualty insurance businesses, and foreign general insurance and life insurance operations, in order to emerge as a "solidly profitable" company with "good long-term growth prospects." In a reversal from his prior plans, Mr. Liddy announced that AIG would sell its domestic life insurance and annuities units to repay the government loan. AIG was considering offers for the various divisions it plans to sell.

123.    Expressing concerns with AIG's rapid use of the bailout loan, Moody's downgraded AIG's senior unsecured debt and Standard & Poor's changed AIG's credit watch status to negative.

124.    On November 10, 2008, the Federal Reserve and the Treasury announced in a press release that the bailout of AIG was restructured once again. The new measures included: (1) the purchase of $40 billion of newly issued AIG preferred shares; (2) the reduction of the existing credit facility with the Federal Reserve from $85 billion to $60 billion; (3) the modification of the existing credit facility to reduce the interest rate on the facility to three-month Libor plus 3% and the fee on the undrawn funds to 0.75%; (4) the extension of the length of the facility from two years to five years; and (5) the creation of two additional lending facilities by the Federal Reserve Bank of New York to "alleviate capital and liquidity pressures on AIG associated with two distinct portfolios of mortgage-related securities."

125.    The two additional lending facilities announced by the Federal Reserve on November 10, 2008 are:  (1) the Residential Mortgage-Backed Securities Facility, in which the Federal Reserve Bank of New York will lend up to $22.5 billion to a newly formed LLC to fund the purchase of residential mortgage-backed securities from AIG's U.S. securities lending collateral portfolio, with AIG contributing $1 billion; and (2) the Collateralized Debt Obligations Facility, in which the Federal Reserve Bank of New York will lend up to $30 billion to another newly formed LLC to fund the purchase of CDOs against which AIGFP has written CDS, with AIG contributing $5 billion.

126.    According to an article entitled "AIG Seeks to Ease Its Bailout Terms" published in *The Wall Street Journal* on February 24, 2009, the government aid to AIG, as restructured on November 9, 2008, totaled approximately $150 billion.

127.    According to an article entitled "U.S. Provides More Aid to Big Insurer" published in *The New York Times* on November 11, 2008, AIG reported a loss of $24.47 billion, or $9.05 per share, for the third quarter, and the new arrangement with the government requires

AIG to limit its executive compensation and benefits and to freeze the size of the annual bonus pool for the top 70 executives.

128.    In the wake of AIG reporting more than $11 billion in losses in its CDS portfolio for the fourth quarter of 2007 and having its auditors find "material weakness in its internal controls" relating to the valuation of this portfolio, in February 2008, AIG's then-CEO, Defendant Sullivan, had begun to lobby for new, relaxed accounting rules tied to FAS 17 write-downs that would apply to the valuation of the CDS portfolio.  Under the relaxed accounting rules that Defendant Sullivan advocated, AIG would not have had to report the kinds of losses in its CDS portfolio that AIG, in its November and December 2007 disclosures, hid from investors. But the rules that AIG seeks to change were indisputably in effect when AIG made its fraudulent disclosures in November and December 2007.  Despite acknowledging its losses in the summer of 2008, only days before its near-collapse, ratings downgrade, and the government bailout/takeover, AIG continued to insist that its profitability would be restored and that AIG had the ability to satisfy all of its capital requirements.

129.    After having been alerted by PwC and the Office of Thrift Supervision about CDO valuation issues, Defendant Sullivan nevertheless expressed public confidence in AIG in December 2007 and lobbied the AIG board on March 11, 2008 for a cash bonus of approximately $5.7 million for his performance in 2007.  That same month, the board approved a new compensation package for Defendant Sullivan that included a $15 million golden parachute. He had received total compensation between 2005 and 2007 of more than $25 million. Defendant Sullivan earned $4.6 million in salary and bonus in 2007, and was awarded $47 million in severance and long-term compensation.  He told the Oversight Committee that he does not plan to return any of the money.

130.    In his testimony before the Oversight Committee on October 7, 2008, Defendant Sullivan continued insisting that, during his tenure as AIG's CEO, he achieved "unprecedented transparency," and blamed AIG's financial troubles on the mark-to-market accounting required by FAS 157.  Similarly, when testifying before the Oversight Committee, Mr. Willumstad blamed the crisis that led to the bailout on mark-to-market accounting rules that resulted in unrealized mark-to-market losses.  Both former CEOs refused to take any blame for the crisis they brought upon AIG and insist that they did everything they could to protect AIG shareholders, including Mr. Greenberg.  The Oversight Committee chairman, Rep. Henry Waxman, however, openly disagreed with that assessment, particularly after finding that Mr. St. Denis had been excluded from the audit of AIG's financial products division after he expressed concern about AIG's valuation of its financial products liabilities.

## LOSS CAUSATION

131.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiff.

132.    In or about January 2008, Mr. Greenberg acquired AIG's securities at artificially inflated prices and thereby suffered two separate and distinct economic losses:

(a)    He acquired AIG securities at artificially inflated prices, and incurred hundreds of millions of dollars of losses on those securities when corrective disclosures of the true facts respecting AIG's financial position caused the price of AIG stock to plummet;

(b)    Because he acquired AIG securities at artificially inflated prices, he was obligated to and did pay income tax on the value of the acquired securities

many times more than what he should have been required to pay had the securities been valued at their true price.

## SCIENTER ALLEGATIONS

133.   As alleged herein, Defendants acted with scienter because, as stated in more detail and with particularity above, they acted with intent to deceive, manipulate, or defraud and/or acted with such recklessness that their behaviors constituted an extreme departure from the standards of ordinary care to the extent that the danger caused by their material misrepresentations and omissions was either known to the Defendants or so obvious that they must have been aware of it.

134.   As alleged herein and stated in more detail and with particularity above, Defendants acted with scienter because they either knew facts or had access to information suggesting that their public statements were not accurate or failed to check information they had a duty to monitor.

## RELIANCE

135.   As alleged herein and stated in more detail and with particularity above, Mr. Greenberg received, read, and relied on Defendants' public documents and statements containing material misrepresentations and omissions when he acquired AIG securities in or about January 2008.

136.   At all relevant times, the market for AIG's securities was an efficient market for, among others, the following reasons:  (1) AIG's securities met the requirements for listing, and were listed and actively traded on the New York Stock Exchange (the "NYSE"), a highly efficient and automated market; (2) as a regular issuer, AIG filed period public reports with the SEC and the NYSE; (3) AIG regularly communicated with public investors via established

market communication mechanisms; and (4) AIG was followed by several securities analysts employed by major brokerage firms who issued reports which were distributed to the sales force and certain customers of the firms.  These reports were publicly available and entered the public marketplace.

137.    As a result of the foregoing, the market for AIG's securities promptly digested current information regarding AIG from all publicly available sources and reflected such information in the price of AIG's securities.  Under these circumstances, all acquirers of AIG's securities in or about January 2008 suffered similar injury through the acquisition of AIG's securities at artificially inflated prices and a presumption of reliance applies.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against All Defendants)

138.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 137 as if fully set forth herein.

139.    This claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, on behalf of Mr. Greenberg against all Defendants.

140.    Defendants, individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, employed devices, schemes, and artifices to defraud, made untrue statements of material fact and/or omitted to state material facts necessary to render statements made not misleading, and engaged in acts, practices and courses of business which worked a fraud and deceit upon Mr. Greenberg, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

141.    Defendants' false and misleading statements and omissions were made with scienter and were intended to, and did, as alleged herein deceive the investing public, including Mr. Greenberg.

142.    Defendants were individually and collectively responsible for making the statements and omissions alleged herein, by virtue of having prepared, approved, signed, and/or disseminated documents which contained untrue statements of material fact and/or having made direct statements to the investing public as detailed herein.

143.    During the period relevant to Mr. Greenberg's claims, Defendants Sullivan, Bensinger, Cassano, Bollenbach, Miles, Offit, and Sutton (the "Individual Defendants") occupied executive-level positions at AIG and were privy to nonpublic information concerning AIG.  Each of them knew or recklessly disregarded the adverse facts about AIG's financial condition specified herein and intentionally failed to disclose those facts.

144.    Mr. Greenberg read and reviewed the materials and information disseminated by Defendants, and attended investor meetings and conference calls by and through his representatives.  Mr. Greenberg reasonably relied on Defendants' material misrepresentations and omissions in deciding to acquire AIG securities on or about January 30, 2008.

145.    Defendants' material misrepresentations and omissions were made in connection with the purchase or sale of AIG's securities.

146.    As a direct and proximate result of the Defendants' wrongful conduct, Mr. Greenberg, in connection with his acquisitions of AIG securities on or about January 30, 2008, suffered two separate and distinct economic losses as stated above in paragraphs 132(a) and 132(b).

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

147.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 146 above as if fully set forth herein.

148.    The Individual Defendants, acted as controlling persons of AIG within the meaning of § 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and awareness of the AIG's operations and intimate knowledge of the false financial statements filed with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control the content and dissemination of the various statements which are alleged, herein, to have been false and misleading when made by or on behalf of AIG. The Individual Defendants made public statements to AIG investors, participated in conference calls with investors, and were provided with or had unlimited access to copies of AIG's reports, press releases, public filings, and other statements alleged to have been misleading, prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

149.    In particular, throughout the period relevant to Mr. Greenberg's claims, the Individual Defendants exercised control over AIG by virtue of, among other things, their executive positions with AIG, the key roles they played in AIG's management, and their direct involvement in AIG's daily operations, including its financial reporting and accounting functions.

150.    As set forth above, the Individual Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as

controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Mr. Greenberg, in connection with his acquisitions of AIG securities on or about January 30, 2008, suffered two separate and distinct economic losses as stated above in paragraphs 132(a) and 132(b).

## COUNT III

### Common Law Fraud
### (Against All Defendants)

151.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 150 as if fully set forth herein.

152.    The representations by Defendants alleged in paragraphs 1 through 150 above, regarding AIG's losses and potential losses in AIG's portfolio of CDS and AIG's financial condition, were false and misleading, as AIG finally revealed in its February 28, 2008 Form 10-K.

153.    Defendants knew such representations minimizing the potential losses of its CDS portfolio and misrepresenting AIG's financial condition were false, and were aware that they were intentionally concealing material facts regarding AIG's financial condition and the loss in value of AIG's CDS portfolio.

154.    Alternatively, in light of AIG's weak and ineffective internal controls over financial reporting related to its CDS portfolio, Defendants had no reasonable foundation for such representations regarding the losses in its CDS portfolio and AIG's financial condition and recklessly disregarded that such representations were false.

155.    Defendants made such misrepresentations and omissions in order to influence Mr.
Greenberg and other investors to acquire AIG shares in or about January 2008, as well as during
prior periods.

156.    In reasonable reliance on such fraudulent disclosures and omissions by
Defendants, Mr. Greenberg did acquire shares of AIG stock in or about January 2008.

157.    Defendants acted with gross, wanton, or willful fraud or other morally culpable
conduct. Defendants' conduct was malicious, intentional, so reckless or wantonly negligent as to
be the equivalent of a conscious disregard of the rights of others, including Mr. Greenberg,
and/or undertaken in bad faith with a conscious indifference to Mr. Greenberg's rights as well as
the rights of the other investors.

158.    As a proximate cause of AIG's wrongful conduct, Mr. Greenberg suffered two
separate and distinct economic losses as stated above in paragraphs 132(a) and 132(b).:

159.    By virtue of the material misrepresentations and omissions alleged herein,
Defendants are liable to Mr. Greenberg for compensatory and punitive damages for actual and/or
constructive fraud under the common law of the State of New York in an amount to be
determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

(a)    awarding Plaintiff damages to be determined at trial for all injuries suffered as a
result of Defendants' wrongdoing;

(b)    awarding Plaintiff prejudgment interest at the maximum rate allowable by law;

(c)    awarding Plaintiff punitive damages to be determined at trial under New York
law;

(d)     awarding Plaintiff his reasonable attorney's fees, expenses, and costs of this litigation; and

(e)     awarding Plaintiff such other and further relief as he may show himself to be justly entitled.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues triable to a jury.


Dated:  February 27, 2009

                                        Respectfully submitted,

                                        BOIES, SCHILLER & FLEXNER LLP

                                        By:  *Nicholas A. Gravante, Jr.*
                                            Nicholas A. Gravante. Jr.
                                            Steven I. Froot
                                            Vincent Y. Liu
                                            575 Lexington Avenue
                                            7th Floor
                                            New York, NY  10022
                                            Phone:  (212) 446-2300
                                            Fax:  (212) 446-2350

                                            David Boies
                                            333 Main Street
                                            Armonk, New York 10504
                                            Telephone:  (914) 749-8200
                                            Fax:  (914) 749-8300

                                            *Attorneys for Plaintiff Maurice R. Greenberg*